## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

JACK "JAY" PALMER, JR. )
1328 County Road 29 ) **CIVIL ACTION**
Lowndesboro, AL 36752, )
 )
    Plaintiff, ) No. _____
 )
   vs. )
 )
INFOSYS LIMITED )
(f/k/a Infosys Technologies, Ltd.) )
Electronics City, Hosur Road )
Bangalore, 560 100 India ) **JURY TRIAL DEMANDED**
 *c/o Its Registered Agent* )
 The Corporation Trust Company )
 820 Bear Tavern Road )
 West Trenton, NJ 08628 )
 )
NARAYANA MURTHY )
(individual and corporate capacity) )
c/o Infosys Ltd. )
Electronics City, Hosur Road )
Bangalore, 560 100 India )
 )
JEFFREY FRIEDEL )
(individual and corporate capacity) )
19 West Parkway Place )
Holmdel, NJ  07733-1937 )
 )
S.D. SHIBULAL )
(individual and corporate capacity) )
c/o Infosys Ltd. )
Electronics City, Hosur Road )
Bangalore, 560 100 India )
 )
    and )
 )
John Does 1-6 )
(individual and corporate capacity), )
 )
    Defendants. )

## INTRODUCTION

1. Plaintiff Jack "Jay" Palmer, Jr., was a successful employee of Defendant Infosys

Ltd. ("Infosys") until he complained that Infosys had operated a widespread scheme of

systematic visa fraud.  As a result of Mr. Palmer's information, Infosys paid $34 million to the U.S. Government as part of the largest visa fraud case in American history.

2.     Infosys was embarrassed and angered by Mr. Palmer's revelations of Infosys' conduct.

3.     In retaliation for Mr. Palmer's actions, Infosys punished Mr. Palmer by blacklisting him, putting him on leave, denying him work, denying him promotions and bonuses, eventually demanding his resignation and denying him re-hire.  Infosys' retaliation continues to this day by putting Mr. Palmer on a blacklist of former employees who are ineligible for rehire.

4.     Infosys' illegal visa scheme defrauded the federal government by claiming that thousands of Indian nationals were qualified for a less expensive immigration visa and that they were not performing work in the United States that could not be performed by U.S. citizens. Infosys engaged in a systematic effort of creating fraudulent letters and false descriptions of the work performed.

5.     Infosys then falsely reported to investors the true limits on the number of employees it was permitted to engage in the United States, its expenses, its revenues, its profits and its continuing criminal conduct that prevented thousands of Americans from working in these positions.

6.     In violation of federal law, Infosys improperly concealed known illegal conduct, including conduct that related to violations of federal immigration and tax laws, and use of the mails and wires to commit such fraud, thereby misstating its potential liabilities and expenses in an effort to misrepresent its financial position and exceed analysts' estimates.

7.     Mr. Palmer reported Infosys' violations of state and federal securities laws, mail fraud and wire fraud to Defendants, his supervisor and to others within Infosys.

8.    Infosys retaliated against, terminated and constructively discharged, and will not rehire, Mr. Palmer because of his protected activity.

9.    Infosys' retaliation against Mr. Palmer violated numerous federal laws including 18 U.S.C. § 1514, the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley Act") and the anti-retaliation provisions of the False Claims Act, 31 U.S.C. § 3730(h) (the "FCA").

10.    Mr. Palmer brings this case to redress the damages caused by the unlawful discrimination and retaliation committed by Infosys, Narayana Murthy, Jeffrey Friedel, S.D. Shibulal, and John Doe Defendants 1-6 (collectively referenced as the "Defendants").

## JURISDICTION

11. Mr. Palmer incorporates into this paragraph his allegations from each of the paragraphs above.

12.    Jurisdiction is proper under 28 U.S.C. § 1331 because the Complaint raises questions of federal law, including, without limitation, Defendants' retaliation in violation of the Sarbanes-Oxley Act and FCA.

13. Jurisdiction is proper under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties.  Mr. Palmer is a citizen of Alabama.  None of the Defendants are citizens of Alabama.

14. Jurisdiction is proper because more than 180 days before the filing of this Complaint, Mr. Palmer filed a charge of retaliation under the Sarbanes-Oxley Act with the Occupational Safety and Health Administration ("OSHA") and the United States Department of Labor.  No resolution of this matter has yet occurred.  Accordingly, Mr. Palmer has a right to bring this action in the United States District Court.

15. Personal jurisdiction is appropriate because Defendants conduct their business in this District.  Further, personal jurisdiction is appropriate in this District because Defendant Friedel is a resident of this District.

## VENUE

16. Venue is proper in this District under 28 U.S.C. § 1391.  Where aliens and non-aliens are joined as defendants, venue for the entire action is proper in any district where it is correct as to non-alien defendants.  Venue is correct as to non-alien Defendant Friedel because he is a resident of this District and all other Defendants are aliens.

17. Venue is also appropriate here because "in the case of multiple defendants, [where] any one defendant can be found, resides, transacts business, or in which any act proscribed by [31 U.S.C. § 3729] occurred." 31 U.S.C. § 3732(a).  Defendant Friedel can be found, resides and transacts business in Monmouth County, New Jersey, in this District.

18. Some or all of the activity that gave rise to these claims occurred in this District.

19. This action arises from a continuing course of conduct by Defendants to retaliate against Mr. Palmer for reasonably reporting Defendants' illegal conduct in violation of U.S. laws including its securities laws, immigration laws, defrauding the U.S. Government by failing to use generally accepted accounting principles.

## FACTS

**A.      Parties**

20.      During all relevant periods, Mr. Palmer maintained a residence in Alabama. Mr. Palmer is not, and never has been, a resident of New Jersey.

21.      Infosys is an Indian corporation that is licensed and doing business in the United States.  Infosys is a Bangalore-based enterprise with 160,000 employees (located worldwide) and has reported revenues of $7.9 billion. Seventy percent (70%) of this revenue is from consulting in the United States.

22. Infosys is an alien corporation.

23. Infosys is a publicly-traded company subject to Section 12 of the Securities Exchange Act of 1934.

24. The shares of Infosys (Stock Symbol: INFY) are traded, among other places, as American Depositary Receipts ("ADRs") on the NASDAQ stock exchange.

25. Defendant Narayana Murthy ("Murthy") is and/or was the founder, largest individual shareholder, employee and officer of Infosys and held the title of Chief Executive Officer of Infosys. Murthy is not a citizen of New Jersey. He is an alien to the United States. On information or belief, Murthy made some of the decisions to retaliate against Mr. Palmer or otherwise approved, supported and/or ratified the decisions to retaliate against Mr. Palmer.

26. Defendant Jeffrey Friedel ("Friedel") is and/or was an employee and officer of Infosys. Friedel resides in Monmouth County, New Jersey, in this District and in the division of Trenton. On information or belief, Friedel made some of the decisions to retaliate against Mr. Palmer or otherwise approved, supported and/or ratified the decisions to retaliate against Mr. Palmer. More specifically, Infosys has asserted that Friedel made the decision to deny Mr. Palmer any chance of rehire.

27. Defendant S.D. Shibulal ("Shibulal") is and/or was the Chief Executive Officer of Infosys. Shibulal is not a citizen of New Jersey. He is an alien to the United States. On information or belief, Shibulal made some of the decisions to retaliate against Mr. Palmer or otherwise approved, supported and/or ratified the decisions to retaliate against Mr. Palmer.

28. Defendants John Does 1-6 are individuals who participated in and approved and otherwise aided and abetted the decisions to retaliate against Mr. Palmer.

29. Defendants individually and collectively participated in and approved the decisions to retaliate against Mr. Palmer.

30.     Mr. Palmer is an "<u>employee</u>" as 29 C.F.R. § 1980.101 defines and uses that term.

31.     Infosys is a "<u>covered person</u>" as 29 C.F.R. § 1980.101 defines and uses those terms.

32.     Defendants Friedel, Murthy, Shibulal and John Does 1-6 are "<u>covered person(s)</u>" as 29 C.F.R. § 1980.101 defines and uses those terms.

33.     Infosys hired Mr. Palmer in 2008 as a Principal Consultant in the Enterprise Solutions Practice.

**B.     Infosys Engaged In Criminal Conduct To Evade U.S. Immigration Requirements, U.S. Tax Laws And Materially Misstate Information Relevant To Reasonable Investors.**

34.     Infosys' business model depends, or depended, on its ability to bring Indian nationals into the United States for employment purposes.

35.     However, H-1B employment visas are subject to an annual cap of 65,000 visas. This visa limit effectively limits business operations and results in competition among international firms for these visas.

36.     Alternatively, some companies, including Infosys, defraud the U.S. government by seeking less restrictive visas for individuals who are not eligible for such lesser visas.

37.     Infosys has agreed that it brings foreign nationals into the United States in order to perform work and fulfill contracts with its customers under two (2) visa classification programs relevant to this matter, H-1B and B-1:

a.  The H-1B visa is a non-immigrant visa that allows an employer to temporarily employ a foreign national in a "specialty occupation." A specialty occupation is one that requires a theoretical and practical application of a body of specialized knowledge and attainment of a bachelor's or higher degree or its equivalent in experience for the specific specialty. The application process is highly regulated and requires the submission of a Labor Condition Application that describes the intended occupation and specific geographical place of employment and certifies that the salary of the proposed employee is commensurate with similarly employed United

States workers, that the working conditions of the proposed employees will not adversely affect the conditions of workers similarly employed, and that there is not a strike, lockout, or work stoppage at the company. The annual cap for new H-1B visa issuances is $65,000. The base fee for an H-1B application is $325 with an additional $500 Fraud Prevention and Detection fee. Additional fees can include $1500 for the American Competitiveness and Workforce Improvement Act fee to fund the training of United States citizens and $2000 for an application by companies with more than 50 employees in the United States of which more than 50 percent are in H-1B or L-1 status.

b. The B-1 visa is a non-immigrant visa that allows a foreign national to temporarily enter the United States for business purposes. Business purposes entail activities such as consulting with business associates; traveling for business conventions; negotiating a contract; participating in short term training, and certain other activities of a temporary nature incident to international trade or commerce. It does not include local employment or labor for hire. Pursuant to law and regulations, B-1 visa holders may not perform skilled or unskilled labor. B-1 visas are valid for ten years, and the application fee for a B-1 visa is approximately $160.

38.     In connection with arranging travel for B-1 visa holders, Infosys generates or causes to be generated "invitation letters" stating that certain Infosys employees will travel to the United States in order to handle aspects of contracted business or other business activities. These "invitation letters" are often submitted to and reviewed by U.S. Consular Officials and other immigration officials in support of the B-1 visa holder's travel into the United States.

39.     Infosys failed to maintain accurate Form I-9 records for many of its foreign nationals in the United States in 2010 and 2011 as required by law. During that period, Infosys did not accurately complete a Form I-9 Employee Eligibility Verification Form for many persons that it employed in the United States and did not properly maintain I-9 forms, including a widespread failure to update and re-verify the employment authorization status of a substantial percentage of its foreign national employees.

40.    After an extensive investigation into Infosys' employment practices, the

United States has determined that:

1.  The Immigration and Nationality Act indicates that a B-1 visa holder may not come to the United States to perform skilled or unskilled labor. The controlling Code of Federal Regulation indicates that the term "business" as used by a B-1 visa holder does not include local employment or labor for hire. The governing policies within the Department of State's Foreign Affairs Manual and the Department of Homeland Security's Inspector's Field Manual interpret permissible B-1 activities as an alien coming to the United State to engage in commercial transactions (e.g., buying or selling) that do not involve gainful employment in the United States; to negotiate contracts; to consult with business associates, including attending meetings of the Board of Directors of a U.S. corporation; to litigate; to participate in scientific, educational, professional, or business conventions, conferences or seminars; or to undertake independent research.

2.  To circumvent the requirements, limitations, and governmental oversight of the H-1B visa program, Infosys knowingly and unlawfully used B-1 visa holders to perform skilled labor in order to fill positions in the United States for employment that would otherwise be performed by United States citizens or require legitimate H-1B visa holders, for the purposes of increasing profits, minimizing costs of securing visas, increasing flexibility of employee movement, obtaining an unfair advantage over competitors, and avoiding tax liabilities.

3.  Infosys took, among others, the following unlawful actions, in furtherance of its unlawful scheme:

    a.  Infosys submitted "invitation letters" to U.S. Consular Officials that contained materially false representations regarding the true purpose of a B-1 visa holder's travel in order to deceive U.S. Consular Officials and/or Customs and Border Protection Officers and secure entry of the visa holder into the United States. These "invitation letters" often stated that the purpose of travel was for "meetings" or "discussions" when the true purpose was to engage in activities not authorized under a B-1 visa. Examples from such invitation letters submitted to U.S. Consular Officials in order to mislead the officials are as follows:

        (1)  An invitation letter submitted on or about July 3, 2008, relating to an individual known as MG, stated that the purpose of the trip was for "customer discussions and related business development activities," when, in fact, as known by Infosys, the purpose of the trip was to engage in activities not authorized under a B-1 visa, which included, but was not limited to, coding and programming.

(2)     An invitation letter submitted on or about July 15, 2009, relating to an individual known as SI, stated that the purpose of the trip was for "customer discussions and related business development activities," when, in fact, as known by Infosys, the purpose of the trip was to engage in activities not authorized under a B-1 visa, which included, but was not limited to, coding and programming.

(3)     An invitation letter submitted on or about May 5, 2010, relating to an individual known as AR, stated that the individual "would be involved in meetings and business discussions," when, in fact, as known by Infosys, the purpose of the trip was to engage in activities not authorized under a B-1 visa, which included, but was not limited to, coding and programming.

(4)     An invitation letter submitted on or about March 9, 2011, relating to an individual known as, stated that "the purpose of the trip was for meetings and discussions," when, in fact, as known by Infosys, the purpose of the trip was to engage in activities not authorized under a B-1 visa, which included, but was not limited to, coding and programming.

b.   Infosys provided instructions to B-1 visa holders regarding how to deceive U.S. Consular Officials and/or Customs and Border Protection Officers, including specific direction regarding the avoidance of certain terminology, the avoidance of contract terms, and the use of misleading job titles, in order to secure entry of the visa holder into the United States. Examples from a "Do's and Don'ts" memorandum provided by Infosys to foreign nationals entering the United States on a B-1 visa included the following directions:

(1)     "Do not mention activities like implementation, design & testing, consulting, etc., which sound like work."

(2)     "Also do not use words like, [sic] work, activity, etc., in the invitation letter."

(3)     "Please do not mention anything about contract rates."

c.   Infosys directed foreign nationals to inform U.S. Consular Officials and/or Customs and Border Protection Officers that their destination in the United States was the same as that provided in the Labor Condition Application; however, Infosys and the foreign nationals knew that the foreign nationals had been assigned to other destinations in the United States. This was done in order to secure entry of the visa holder into the United States without requiring the submission of an additional Labor Condition Application and to avoid additional scrutiny by U.S. officials. Examples of such false representations are as follows:

(1)   On or about November 26, 2008, Infosys directed an individual known as ST to tell U.S. Consular Officials that he was destined for Seattle, Washington, consistent with the Labor Condition Application; however, his true destination was Henrico, Virginia.

(2)   On or about October 28, 2009, Infosys directed an individual known as VG to tell U.S. Consular Officials that he was destined for Seattle, Washington, consistent with the Labor Condition Application; however, his true destination was Bentonville, Arkansas.

(3)   On or about October 29, 2010, Infosys directed an individual known as SK to tell U.S. Consular Officials that he was destined for Beaverton, Oregon, consistent with the Labor Condition Application; however, his true destination was Sunnyvale, California.

(4)   On or about November 3, 2011, Infosys directed an individual known as BS to tell U.S. Consular Officials that he was destined for Houston, Texas, consistent with the Labor Condition Application; however, his true destination was Milwaukee, Wisconsin.

d.   In some circumstances, Infosys wrote and revised contracts with clients in order to conceal the fact that Infosys was providing B-1 visa holders to perform jobs that involved skilled or unskilled labor that were otherwise required to be performed by United States citizens or require legitimate H-1B visa holders. For example, on or about September 29, 2009, in a series of emails between Infosys employees, Infosys directed its employees to convert a "time and materials contract" – a contract that disclosed the names and billing rates of all individuals working on a project – to a "fixed price contract" – a contract that disclosed only the total price for services performed. This change allowed and was intended by Infosys to conceal the fact that B-1 visa holders were performing jobs that involved skilled or unskilled labor that were otherwise required to be performed by United States citizens or require legitimate H-1B visa holders.

e.   Infosys used B-1 visa holders to perform jobs that involved skilled labor that were instead required to be performed by United States citizens or required legitimate H-1B visa holders

41.   The above-mentioned statements of the United States are true.

42.     In March 2010, Mr. Palmer attended planning meetings in Bangalore, India. During these meetings, Infosys' managers expressed concerns about visa caps, increased fees for H-1B visas, and other restrictions the United States had placed on immigration. Infosys' managers discussed the need to and ways to "creatively" get around these H-1B restrictions to increase profits and the value of Infosys stock.

43.     Specifically, Infosys' managers discussed the need to increase the use of B-1 visas to send lower level and unskilled Indian workers to the United States, thereby avoiding the restrictions and high costs imposed by the United States for H-1B visas and fulfilling its client demands at a lower cost and increased profits for Infosys.

44.     In May 2010, Mr. Palmer's managers, Neeraj Saxena ("Neeraj") and Deepak Hangal ("Deepak"), told Mr. Palmer that the U.S. Consulate in India was rejecting B-1 visa applications due to the large number of applications Infosys was submitting. Accordingly, Infosys was required to have Americans or American companies issue "welcome letters" to verify that the employees were coming to the U.S. for legitimate B-1 purposes.

45.     Neeraj, Deepak and Gopi Krishnan ("Krishnan"), Mr. Palmer's managers in India, instructed Mr. Palmer to write these "welcome letters."

46.     Mr. Palmer learned that these "welcome letters" were false, as they falsely stated that foreign employees were coming to the U.S. for a "visit."

47.     In truth, they were coming to "work" at client sites, which is impermissible activity under a B-1 visa.

48.     Mr. Palmer learned that the "welcome letter" template also included instructions to B-1 employees on how to avoid detection when entering the United States.

49.     Mr. Palmer refused to sign the "welcome letters," and was instructed to join a conference call with Krishnan and Indranil Mukherjee ("Mukherjee").

50.     Infosys, by and through Krishnan and Mukherjee, told Mr. Palmer that if he did not sign the welcome letters, it would drastically affect Infosys' profit, and Mr. Palmer's salary and standing in the long run.

51.     When Mr. Palmer informed Krishnan and Mukherjee that these practices were illegal, they chastised Mr. Palmer for not being a "team player."

52.     Infosys transferred Mr. Palmer to a project in Chicago, Illinois, where he learned of additional Infosys B-1 employees working illegally.

53.     Mr. Palmer obtained a copy of the "welcome letter" for one B-1 employee named Vishal Gaur ("Gaur").  The letter falsely stated that Gaur was in the U.S. for "business meetings and workshops" at Infosys' offices, when he was actually working on client projects in Chicago, Illinois.

54.     In September 2010, Defendants sent Indian Delivery Manager Anjali Yadav ("Yadav") from India to talk to Mr. Palmer and told Mr. Palmer to "keep quiet."  Yadav stressed that it was important to the profits of Mr. Palmer's division and to Infosys from a financial standpoint to continue the immigration violations.

55.     Infosys, by and through Defendants, also requested that Mr. Palmer rewrite "Time and Material" contracts ("T&M contracts"), which revealed hourly work by illegal B-1 holders to Fixed Price contracts ("FP contracts"), which do not contain names of billing employees.

56.     Mr. Palmer refused to change T&M contracts to FP contracts.

57.     Infosys, by and through Defendants, also instructed Mr. Palmer to send invoices to clients for work performed illegally by B-1 visa holders, including Gaur.

58.     Mr. Palmer refused.

59.     In addition to violating immigration laws, Infosys' visa practices violated state and federal tax laws. Infosys places American employees and H-1B visa holders into its payroll systems, which withholds taxes from employees and pays them to the federal government.  B-1

12

visa holders, in contrast, are not placed into Infosys' payroll system, and therefore pay no federal taxes.

60.     By illegally placing Indian employees on B-1 visas instead of the required H-1B visas, Infosys and its employees effectively denied the United States government and state governments of tax revenue owed on the wages of B-1 visa holders.

61.     By engaging in unlawful visa and tax practices, Infosys unlawfully inflated its profits and revenue.

62.     Infosys, by and through Defendants, then submitted reports to the Securities and Exchange Commission (the "SEC") containing false and misleading statements of its profits, revenue, expenses and projected revenue.

63.     Infosys failed to disclose that, if it complied with U.S. immigration laws, it would be limited in the number of employees it would be allowed to engage in the United States and that its financial projections would be materially altered.

64.     These false and misleading reports were contrived by Infosys and/or Defendants for the unlawful purpose of inflating Infosys' revenues and misleading its shareholders.

**C.     Mr. Palmer Engaged In Protected Activity.**

65.     Mr. Palmer reasonably and subjectively believed that Infosys was engaged in violations of the immigration laws of the United States of America, the misreporting of financial activity in violation of federal securities laws and the defrauding of the U.S. Government.

66.     Mr. Palmer engaged in protected activity when he reported such concerns regarding Infosys' deliberate concealment of immigration law violations in an effort to increase profits and the value of stock.

67.     Mr. Palmer reported these concerns to Infosys' managers with supervisory authority over him and/or Infosys' managers with the authority to investigate, discover or terminate the misconduct.

68.     Mr. Palmer reported illegal conduct to Infosys' employees, including HR Managers Linda Manning ("Manning") and Lynne Grant ("Grant"), and Friedel, Infosys' in-house legal counsel.

69.     Mr. Palmer reported misconduct related to securities fraud, violations of the SEC's rules and regulations, and/or fraud against shareholders of Infosys by doing one or more of the following: (1) leaving information on Infosys' internal whistleblower hotline; and (2) sending electronic mail communications to Murthy, Friedel, Grant and Gopalakrishnan concerning Infosys' securities fraud.

70.     In October 2010, Mr. Palmer reported the illegal conduct of Infosys and its efforts to falsely increase profits and stock value by concealing its illegal conduct to Friedel, Grant and Manning.

71.     Mr. Friedel informed Mr. Palmer he should file a whistleblower complaint pursuant to Infosys' Sarbanes-Oxley Act Whistleblower Policy.

72.     On or around October 11, 2010, Mr. Palmer filed an Internal Whistleblower Complaint regarding the illegal activities including B-1 visa fraud, I-9 activities, concealment of this activity to boost Infosys' profits, tax fraud and other activities that had a material impact on Infosys' statements to investors.

73.     Grant instructed Mr. Palmer to fly to Dallas for an "off the record" meeting.

74.     The Dallas meeting consisted of Manning and Grant.

75.     During the course of the meeting, Mr. Palmer gave Grant a file folder which contained evidence of illegal activities, including welcome letters.

76.     Following the filing of his internal whistleblower complaint, Mr. Palmer continued to provide additional information to Defendants regarding visa and tax fraud that Infosys' managers and employees were committing.

77.     Mr. Palmer also reported Infosys' illegal conduct to the Department of Homeland Security, I.C.E., IRS, SEC, members of Congress and Congressional Committees.

78.     Mr. Palmer reported Defendants' conduct that violated, or which he reasonably believed violated, 18 U.S.C. § 1341 (mail fraud).

79.     Mr. Palmer reported Defendants' conduct that violated, or which he reasonably believed violated, 18 U.S.C. § 1343 (wire fraud).

80.     Mr. Palmer reported Defendants' conduct that violated, or which he reasonably believed violated, 18 U.S.C. § 1348 (frauds involving securities).

81.     Mr. Palmer reported Defendants' conduct that violated, or which he reasonably believed violated, rules and regulations of the SEC or other provisions of federal law relating to fraud against shareholders.

82.     Mr. Palmer also reported Defendants' illegal activity by filing an FCA complaint.

83.     Mr. Palmer's FCA complaint was eventually disclosed to Defendants.

84.     After learning that Mr. Palmer had filed an FCA complaint against it, Infosys demanded Mr. Palmer's separation from Infosys and refused to consider him for rehire.

85.     Mr. Palmer's reports were made to his supervisor, to persons within Infosys responsible for whistleblower complaints, to several federal regulatory and law enforcement agencies, members of Congress and/or Congressional committees.

**D.      Infosys Knew That Mr. Palmer Was Engaged In Protected Activity.**

86.     Defendants knew that Mr. Palmer was engaged in activity protected by the Sarbanes-Oxley Act.

87.     Mr. Palmer's direct communications with Gopalakrishnan, Murthy, Friedel and Grant notified Infosys that Mr. Palmer was engaged in protected activity.

88.     Mr. Palmer's public testimony before Congress, and the related media coverage, notified Defendants that Mr. Palmer was engaged in protected activity.

89.     Defendants also knew that Mr. Palmer had filed an FCA complaint as a relator and on behalf of the United States.

**E.      Infosys Admits To Violations.**

90.     In December 2010, Infosys admitted, through Friedel, to Mr. Palmer that "certain changes need to be made to our systems and processes to prevent the misuse of the BV program."

91.     On May 23, 2011, Infosys received a subpoena from a grand jury in the United States District Court for the Eastern District of Texas, requiring documents related to Infosys' use of B-1 visas and Infosys' I-9 practices.

92.     The actions reported by Mr. Palmer had a material impact on Infosys' statements to investors.

93.     The actions reported by Mr. Palmer were sufficiently material that Infosys formally disclosed these facts to investors.

94.     In its March 31, 2012 Form 6-K, filed with the SEC, Infosys acknowledged for the first time that it was the target of a federal grand jury investigation.

95.     Among other things, Infosys conceded that Infosys been advised that "the DHS has found errors in a significant percentage of its Forms I-9 that the DHS has reviewed, and the [U.S.] government may seek to impose fines and penalties on the company in connection with such alleged errors."

96.     Infosys admitted in its Earnings Release that in connection with the grand jury subpoena for certain documents and records related to its sponsorships for, and uses of, B1 business visas, Infosys had been advised by the U.S. Attorney's Office that Infosys "and certain of its employees are targets of the investigation."

97.     In its Earnings Release, Infosys further stated that "in the event that any government undertakes any actions which limit any visa program that the company utilizes, or imposes sanctions, fines or penalties on the company or its employees, this could materially and adversely affect the company's business and results of operations."

**F.     Defendants Retaliated Against Mr. Palmer Because He Engaged In Protected Activity.**

98.     Each of the Defendants was aware of Mr. Palmer's protected activity.

99.     Defendants punished Mr. Palmer for his protected activity by, among other things without limitation, denying him work, bonuses, raises, promotions, ultimately terminating his employment, refusing to rehire him and otherwise adversely affecting the terms and conditions of his employment.

100.    Defendants retaliated against Mr. Palmer, among other reasons, because of his protected activity, including his inquiry into, and reporting of, Infosys's illegal immigration, tax, and financial reporting activity, filing the FCA complaint and for reporting material violations of the Sarbanes-Oxley Act.

101.    Shortly after filing his internal complaint, Mr. Palmer received disturbing phone calls at night from Infosys's Bangalore headquarters calling him a "stupid American."

102.    Two months later, in December 2010, Defendants denied Mr. Palmer his annual bonus.  Sachin and Gopi told Mr. Palmer that he did not receive a bonus because of his internal complaint.

103.    In February, March, May 2011, and December 2011, Mr. Palmer received

multiple death threats while working on an Infosys project.

104.    In April 2011, Defendants placed Mr. Palmer "on the bench," thereby removing him from all active assignments.

105.    In addition, one or more of the Defendants, including Friedel, as Infosys' in-house counsel, published defamatory, exaggerated and inaccurate statements concerning Mr. Palmer.

106.    In June 2011, Defendants removed Mr. Palmer's system access.

107.    In May 2012, Defendants again refused to pay Mr. Palmer his annual bonus.

108.    Defendants' retaliation damaged Mr. Palmer by, among other things, injuring his reputation, diminishing his skills, causing severe emotional and physical distress, affecting his health and denying him compensation to which he would otherwise be entitled.

109.    In November 2013, Defendants demanded Mr. Palmer's resignation under circumstances of pressure and duress.

110.    In November 2013, Defendants terminated and constructively discharged Mr. Palmer's employment with Infosys.

111.    Since November 2013, Mr. Palmer has contacted Infosys and asked to be rehired; however, Infosys, by and through Defendants, has not rehired Mr. Palmer.

112.    As a result of Mr. Palmer's protected conduct, Defendants engaged in, among other adverse employment actions, the following retaliatory conduct in violation of the Sarbanes-Oxley Act and the FCA including without limitation: (a) demanding his discharge; (b) demotion and removal from his prior duties and responsibilities; (c) reprimands; (d) creating and/or permitting harassment and hostile work environment; (e) blacklisting; (f) threats and intimidation; (g) reassignment; (h) denial of bonuses, raises and promotions to which he would otherwise have been entitled; (i) demanding his resignation; (j) terminating his employment; and (k) refusing to rehire him.

113.     Defendants both in their corporate capacities and in their individual capacities conspired, acted in concert and otherwise aided and abetted each other in committing their retaliatory acts towards Mr. Palmer.

114.     Following Mr. Palmer's disclosures, the federal government engaged in an intensive investigation of Infosys' practices.

115.     In the largest settlement ever in an immigration case, Infosys agreed to pay $34 million to resolve claims made by federal prosecutors in Texas.

116.     As part of the record in the case, Infosys acknowledged major errors and omissions in records it kept on its employees in the United States, including Indian temporary technology workers brought in for contract work with American companies.

117.     Consistent with their obligations under Rule 11, federal prosecutors reasonably believed, concluded and alleged that Infosys tried to increase profits by illegally using short-term business visitors' visas to bring workers from India, instead of a more expensive and less accessible temporary employment visa, known as H-1B.

118.     Federal prosecutors and investigators concluded that they had uncovered extensive misuse of visas at Infosys but agreed to the settlement because Infosys had cooperated with the investigation, conceded material errors and had moved to overhaul its record-keeping and improve its visa procedures.

119.     Federal investigators reported that they had uncovered numerous cases in which Infosys had brought in Indian workers on B-1 visas to do work not allowed under that visa.

120.     Investigators from the State Department and the Department of Homeland Security examined 6,500 B-1 visas Infosys had used to bring in Indian workers over five (5) years.

121.     "The vast majority were illegitimate," said George M. Nutwell, a special agent in charge of the State Department Diplomatic Security Service in Houston. Investigators went to

the American companies where the B-1 workers were placed and discovered they were doing programming and technology engineering work similar to H-1B workers. The business visitor visa is primarily for attending training sessions and meetings, not for work.

122.   "Infosys cheated, plain and simple," Special Agent Nutwell said.

123.   Defendants cheated, and then retaliated against Mr. Palmer when he reported Infosys' illegal activity.

124.   For at least the last three (3) years, Infosys has had – and continues to have – open positions in the United States for which Mr. Palmer is qualified.

125.   Mr. Palmer has asked to be considered and hired for open positions for which he is qualified.

126.   Infosys has not hired Mr. Palmer for any of the open positions for which he is qualified.

**G.     Infosys Unsuccessfully Asked Mr. Palmer To Resolve His Claims Against Individuals And, Further, To Agree Not To Seek Re-Employment with Infosys.**

127.   In or around 2012, Infosys proposed that Mr. Palmer resolve his claims against Infosys' individual officers and directors.  Infosys' 2012 Rejected Draft asked Mr. Palmer to release not only Infosys, but also individuals:

> [T]he Company and its affiliates, . . . and all of their respective past and present officers, directors, stockholders, partners, members, employees, agents, representatives, plan administrators, attorneys, insurers and fiduciaries (each in their individual and corporate capacities)(collectively the "Released Parties.")."

128.   This language was rejected.

129.   Neither Mr. Palmer nor Infosys ever agreed to this term.

130.   Similarly, Infosys asked Mr. Palmer to waive his right to seek re-employment.  In the 2012 Rejected Draft, Infosys asked Mr. Palmer to agree to the following:

**Further Employment With The Company.**  You understand and agree that by signing this letter agreement, you are giving up any right you may have to reemployment with the Company.  You further agree that you will not seek, accept, or otherwise pursue employment with the Company, and if you do seek such employment, the Company may decline to employ you at any time, and you will have no legal recourse if the Company so declines.

131.    This language was rejected.

132.    Neither Mr. Palmer nor Infosys ever agreed to this term.

### FIRST CAUSE OF ACTION

### (Discrimination and Retaliation in Violation of Sarbanes-Oxley)

133.    Mr. Palmer incorporates into this paragraph his allegations from each of the preceding paragraphs.

134.    Mr. Palmer was an employee of Infosys.

135.    Infosys is a publicly-traded corporation with a class of securities subject to Section 12 of the Securities Exchange Act.

136.    Infosys is, thus, subject to Section 806 of the Sarbanes-Oxley Act.

137.    In its position statement to OSHA, Infosys has conceded that it is subject to Section 806 of the Sarbanes-Oxley Act.

138.    Mr. Palmer engaged in protected activity, including the reporting of conduct which he reasonably and subjectively believed constituted a violation of 18 U.S.C. §§ 1341, 1343, 1348 or 1348, or a rule or regulation of the SEC or a provision of federal law relating to fraud against shareholders.

139.    Mr. Palmer reported this information to his Infosys supervisors and other executives within Infosys, all of whom had the authority to investigate, discover and/or terminate the misconduct.

140.    In its position statement to OSHA, Infosys has conceded that: "Infosys does not dispute that Jay Palmer engaged in protected activity under Sarbanes Oxley in October 2010

when he complained internally about the handling of certain visa applications by Infosys managers and employees. Mr. Palmer engaged in further protected activity when he provided information to government investigators who were looking into potential misuse of B-1 visas by Indian employees of the Company traveling to the United States. Infosys does not agree with Mr. Palmer's characterization of the subject of some of his complaints as "misconduct related to securities fraud, violations of Securities Exchange Commission's rules and regulations, and/or fraud against shareholders" (Amended Complaint ¶ 63), but for present purposes the characterization as "securities fraud" is immaterial. Infosys agrees that Mr. Palmer engaged in protected activity."

141.    In its position statement to OSHA, Infosys has conceded that "INFOSYS KNEW OF THE PROTECTED ACTIVITY" and that "Infosys also agrees, as explained above, that it was aware that Mr. Palmer had engaged in protected activity."

142.    In retaliation for his protected activity, Mr. Palmer was subjected to numerous unfavorable personnel actions by Defendants including without limitation denial of work, promotions, bonuses, raises, and other compensation, as well as subjecting him to blacklisting, threats, reduced responsibilities, hostile work environment, public criticism, demanding his resignation, terminating and constructively discharging Mr. Palmer's employment, and refusing to rehire Mr. Palmer.

143.    Defendants, both in their corporate capacities and in their individual capacities, conspired and acted in concert in committing their retaliatory acts towards Mr. Palmer and causing him harm.

144.    Defendants retaliated against Mr. Palmer, among other reasons, because of his protected activity.

145.    As a proximate result of Defendants' violations, Mr. Palmer suffered economic and non-economic damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### (Discrimination and Retaliation Against An FCA Whistleblower)

146.    Mr. Palmer incorporates into this paragraph his allegations from each of the preceding paragraphs.

147.    The Anti-Retaliation provision of the FCA prohibits any discrimination or retaliation in employment "because of lawful acts done by the employee . . . in furtherance of an action." 31 U.S.C. § 3730(h).

148.    Mr. Palmer engaged in protected activity, including the filing of an FCA complaint as a relator on behalf of the United States and against Infosys and otherwise cooperating with the investigation and litigation of the complaint.

149.    Defendants knew of Mr. Palmer's protected activity.

150.    Because of his protected activity, Mr. Palmer was subjected to numerous discriminatory and retaliatory employment actions by Defendants including without limitation denial of work, promotions, bonuses, raises, and other compensation, as well as subjecting him to blacklisting, threats, reduced responsibilities, hostile work environment, public criticism, demanding his resignation, terminating and constructively discharging Mr. Palmer's employment, and refusing to rehire Mr. Palmer.

151.    Defendants, both in their corporate capacities and in their individual capacities, conspired and acted in concert in committing their retaliatory acts towards Mr. Palmer and causing him harm.

152.    Defendants retaliated against Mr. Palmer, among other reasons, because of his protected activity.

153.    As a proximate result of Defendants' violations, Mr. Palmer suffered economic and non-economic damages in an amount to be proven at trial.

## **CONCLUSION**

Plaintiff Jack Palmer, Jr., seeks damages to fully, fairly and justly compensate him for his injuries, damages and loss.  Mr. Palmer respectfully requests that this Court enter judgment in his favor and award him past and future economic and non-economic compensatory damages, special damages, punitive or liquidated damages, back pay, front pay, lost benefits, interest, all attorneys' and expert fees, costs, and any equitable relief that the Court deems appropriate, including but not limited to re-employment and promotion.

Respectfully submitted,

**MITTS LAW, LLC**

        */s/ Maurice R. Mitts*

Maurice R. Mitts, Esquire
N.J. Attorney I.D. No. 044771987
1822 Spruce Street
Philadelphia, PA 19103
(215) 866-0120 (telephone)
(215) 866-0121 (facsimile)

**THORMAN PETROV GRIFFIN CO., LPA**

MARK GRIFFIN (0064141)
(to be admitted *Pro Hac Vice*)
mgriffin@tpgfirm.com
CHRISTOPHER P. THORMAN (0056013)
(to be admitted *Pro Hac Vice*)
cthorman@tpgfirm.com
DAN PETROV (0074151)
(to be admitted *Pro Hac Vice*)
dpetrov@tpgfirm.com
BRENDAN D. HEALY (0081225)
(to be admitted *Pro Hac Vice*)
bhealy@tpgfirm.com

3100 Terminal Tower
50 Public Square
Cleveland, Ohio  44113
P: 216-621-3500
F: 216-621-3422

*Counsel for Plaintiff*